UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    Case No. 04-CR-80

TIMOTHY DARNELL WILBURN, SR.,

    Defendant.

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

### I. BACKGROUND

On April 6, 2004, Timothy Darnell Wilburn, Sr. ("Wilburn") was named as the defendant in a one-count indictment returned by a federal grand jury sitting in the Eastern District of Wisconsin. The indictment charges that on or about March 7, 2004, Wilburn, having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess two firearms, to wit, a 9mm Cobray Mac-11 semi-automatic pistol and a 9mm Glock, model 19 pistol, in violation of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Initially, Wilburn entered a plea of not guilty to the charge. Subsequently, Wilburn entered into a plea agreement with the government and entered a plea of guilty. However, for reasons which are not relevant to the issue currently before the court, Wilburn was thereafter allowed to withdraw his plea of guilty. He thereafter had new counsel appointed for him. His trial is currently scheduled to commence before the Honorable Rudolph T. Randa, Chief United States District Judge, on August 15, 2005.

On May 4, 2005, Wilburn (through his newly-appointed counsel) filed a Motion to Suppress. Specifically, Wilburn

> moves the Court to: (1) suppress any and all statements made to City of Milwaukee Police Detective Michael Simonis during a custodial interrogation on March 7, 2004; (2) suppress any and all physical evidence, including a 9mm Cobray Mac-11 semi-automatic pistol and two magazines; and a 9mm Glock pistol, model 19, that were recovered from his residence on March 7, 200[4].

(Def's Mot. at 1.) Because the issues raised by the defendant seemed to involve factual disputes, on May 27, 2005, an evidentiary hearing was conducted with respect to the defendant's motion to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, the defendant's motion to suppress in now fully briefed and is ready for resolution. For the reasons which follow, it is recommended that the defendant's motion to suppress be denied.

## II. DISCUSSION

### A. The Evidentiary Hearing

As previously stated, an evidentiary hearing was conducted on May 27, 2005. Two witnesses testified at that hearing: Milwaukee Police Detective Michael Simonis ("Simonis") and Milwaukee Police Officer Bodo Gajevic ("Gajevic"). The following is a summary of the testimony.

Simonis testified that on March 7, 2004, he was assigned to the intelligence division, investigating firearms offenses. Simonis had met with Gajevic that day and had been advised by Gajevic that he had some information regarding a convicted felon who was supposed to be carrying a firearm with him regularly. Simonis was to assist Gajevic with respect to the investigation.

Simonis and Gajevic went to the area of 40th and Silver Spring and there came into contact with the subject of Gajevic's investigation, to wit, Timothy Wilburn. They observed Wilburn enter

a motor vehicle and drive around the block. Wilburn was known to have a revoked driver's license and so the officers conducted a traffic stop of Wilburn.

After Wilburn's car was stopped both Simonis and Gajevic approached Wilburn's vehicle, Simonis on the passenger side and Gajevic on the driver's side. At this time Simonis did not have his weapon drawn, but was not certain whether Gajevic had his drawn. Gajevic asked Wilburn to get out of the vehicle, which he did. Gajevic then handcuffed Wilburn. Wilburn was frisked for weapons. Other than to handcuff and frisk Wilburn, he was not touched. He was not threatened. Wilburn was advised by Gajevic that he was being arrested for driving with a revoked driver's license. At this time, Wilburn was cooperative.

At this point, Simonis took custody of Wilburn. Simonis placed Wilburn in the rear seat of his unmarked squad car. Simonis got into the driver's seat. Simonis spoke with Wilburn to obtain his vital information, such as his name, date of birth, and what address he was using. After obtaining that information, Simonis ran a "wanted" check on Wilburn. While Simonis and Wilburn sat in the car, Gajevic and other officers went to the residence where the officers believed Wilburn had been staying, i.e., 5611 North 40th Street. The car in which Wilburn and Simonis were sitting was parked directly in front of that residence.

After some period of time, one of the officers came out of the residence and informed Simonis (within earshot of Wilburn) that they had recovered a firearm inside the residence. Wilburn, without anything having been said to him by Simonis, told Simonis that he was concerned about a firearm having been found in the residence, that he was on parole and the discovery of a firearm could cause problems for him, and that he would like to cooperate with the police.

3

Wilburn tried to persuade Simonis to let him go so that he could help the police and thereby help himself. Simonis told Wilburn that he could not let him go. Simonis testified that Wilburn "attempted to persuade me that no, once he went downtown and people knew he was in custody that would be harder for him to do things and I should just let him go right there." (Tr. at 18.) Again, Simonis told him "that was not possible." (Tr. at 18.) Simonis also told Wilburn "to just relax, just hold on, once we get downtown we'll talk." (Tr. at 19.) After about fifteen minutes, the "transport" arrived and Wilburn was removed from the squad car and placed in the transport. During the time that Wilburn was in the squad through the time Wilburn was placed in the transport, Simonis did not see anyone threaten Wilburn, be abusive to him or physically touch him, except to conduct a search of his person. Simonis told the officers that were transporting Wilburn that he "was being cooperative and . . . was not causing any problems." (Tr. at 20.)

Subsequently, at about 3:45 or 3:50 p.m., Simonis again had contact with Wilburn. This was in a holding cell at the city jail. At that time Wilburn was not handcuffed or restrained in any way. Simonis escorted Wilburn to an interview room at the city jail. While he was taken to the interview room, Wilburn was handcuffed. Prior to their going to the interview room, Simonis told Wilburn that, if he needed to, he should use the bathroom before they entered the interview room. Wilburn said he did not need to use the bathroom.

At no time did Wilburn appear to Simonis to be under the influence of alcohol or narcotics. Wilburn at no time appeared to Simonis to be insane; nor did Wilburn do anything bizarre or aberrant in his behavior. Wilburn appeared to Simonis to be of average intelligence. Wilburn is thirty-eight (38) years old. He has numerous past arrests.

Once they entered the interview room, Simonis removed Wilburn's handcuffs. At this time, Simonis did not have a weapon on him. After they sat down at the table Simonis asked Wilburn if he wanted anything. Wilburn said he would like to have a cigarette. Simonis was unable to initially give him one, because Simonis did not have any with him.

Simonis told Wilburn that he was going to be interviewing him regarding "this offense and that he was going to be charged with felon in possession of a firearm, and that I would be reading his rights to him." (Tr. at 26.). Wilburn said that he knew his rights, that he had had his rights read to him numerous times. Nevertheless, Simonis read Wilburn his rights off a card that is provided by the State of Wisconsin Department of Justice. A copy of the card was marked as Exhibit 1 and received into evidence. Wilburn appeared to Simonis to be listening to Simonis as he was reading him his rights. He nodded as Simonis was reading them. After reading Wilburn his rights, Simonis asked Wilburn if he understood his rights and whether he was willing to make a statement. Wilburn said that he understood his rights and wanted to talk. Indeed, on the "summary of interview" Wilburn signed his name under where Simonis had written that he had advised him of his rights and that Wilburn wished to make a statement.

It took about ten to fifteen minutes for Simonis to obtain from Wilburn his personal background information. Wilburn seemed impatient to get through this part of the interview. Simonis then told Wilburn that he "wanted to discuss the firearm that had been recovered, that he was being charged with." (Tr. at 31.). Wilburn wanted to know what type of firearm had been uncovered. After describing the firearm to Wilburn, Wilburn proceeded to explain to Simonis how it came to be that the firearm was in the apartment at 5611 North 40th Street. Wilburn said that the firearm had been brought to the apartment by a "subject who he didn't know" (Tr. at 33), but

5

Wilburn knew it was there. After Wilburn went through with Simonis the written statement that Simonis had prepared based on Wilburn's statement to him, Wilburn signed it. Gajevic had come into the interview room as Simonis was doing this. The above-described portion of Wilburn's interview lasted approximately one hour.

At no time was Wilburn threatened, either verbally or with physical force. At no time were any promises made to Wilburn either to get him to waive his rights or to get him to make a statement. The only thing given to Wilburn were three cigarettes that Wilburn was allowed to smoke. At all times in the interview room Wilburn was neither handcuffed nor had any other restraints on him. Wilburn never asked for any food or drink. He never asked for an attorney. He never asked to telephone anyone besides Ms. Taylor (the woman with whom he resided at 5611 North 40th Street). Wilburn never asked to stop the interview until after Simonis came back after recovering the second gun and told Wilburn that he would not be released.

According to Simonis, after Wilburn had signed the statement, he "was adamant that he wanted me to record something on this form about the fact that he wished to cooperate and that he knew where another firearm was located and that he wanted me to write that down." (Tr. at 37.) Wilburn then told Simonis "that he knew where there was a second firearm located. He said it was a Glock Model 19 with a laser sight on it, and that he was willing to work with us to have that gun taken into police custody." (Tr. at 37.) That was noted on the signed statement and Wilburn acknowledged it. This second gun was talked about for approximately two to five minutes. Simonis left the interview room and traveled to the apartment at 5611 North 40th Street so that he would be at the apartment when Wilburn called to say where the second gun was located. A second gun was recovered at the apartment.

6

Subsequently, later that evening, Simonis returned to interview Wiburn about the second firearm. Wilburn asked if the officers had recovered the second firearm. After Simonis told Wilburn that they had, Wilburn again asked that he be let go. Again, Simonis told him that he was not going to be released. At that point Wilburn became upset and said that he did not want to talk anymore about anything. Thus, Simonis stopped the interview and had Wilburn returned to the holding cell.

Simonis testified that he never promised Wilburn anything in return for his statement. Indeed, Simonis testified as follows: "What I specifically told him is that I could not promise anything. And I told him anybody that tells you that they're promising you anything is lying to you. The only person that can decide is the judge." (Tr. at 47.) To this, according to Simonis, Wilburn responded, "yeah, I know how it goes." (Tr. at 47.)

On cross-examination, Simonis testified that Wilburn "had talked about he knew where there was another gun with a laser on it, and that if it would help him out that he wanted to provide that information. And I told him that recovering a gun was always good, getting a gun off the street, but then he stated that he wanted that written down. He was adamant that he wanted it written." (Tr. at 51.) Thus, the following was written on the statement: "Subject wished to add that he wishes to cooperate; that he knows where another gun is at, a Glock 19 .9 millimeter with a laser beam; that he can go get this gun if it will help him out, period." (Tr. at 50.)

Simonis further testified that, as he was in the squad car with Wilburn as other officers were in the residence at 5611 North 40th Street, Wilburn asked what the officers were doing at the residence. Simonis told Wilburn that the officers were going to talk with the people who lived there. Simonis did not believe that he told Wilburn what they were looking for. Nor did he believe that he would have asked Wilburn if there were any firearms in the residence. Nor did he tell Wilburn that

7

it would be helpful to Wilburn if he told Simonis if there were any weapons in the residence. More to the point, Simonis testified that he never inquired of Wilburn while he was waiting in the squad car with him whether there were any weapons or firearms in his residence.

Simonis testified that while he was questioning Wilburn in the interview room he told him that providing information was going to be helpful to him. However, Simonis did not think he would have told Wilburn that, by providing information, Wilburn would not face any criminal charges. Indeed, Simonis knew that Wilburn was on parole. Therefore, Simonis told Wilburn that "regardless of what he did that he would not be released from custody that night because he was on parole." (Tr. at 65.) This occurred at the end of the interview. (Tr. at 66.)

Simonis further testified that none of the officers asked Wilburn for consent to search the residence. This is because they asked Sophia Taylor for her consent to search the residence and she gave such consent. Indeed, according to Simonis, he spoke with Sophia Taylor several days before the evidentiary hearing and, at that time, she confirmed that she had consented to a search of the residence.

Gajevic testified that he was on duty on March 7, 2004. Gajevic participated in the traffic stop of Wilburn that day. Wilburn was searched upon his arrest and no firearms were found on his person. After Wilburn was placed in handcuffs and while Simonis was talking to Wilburn about the basis for the traffic stop, Gajevic walked to apartment number 7, at 5611 North 40th Street ("apartment 7"). There he was greeted by Sophia Taylor on the steps leading to the sidewalk.

Prior to the traffic stop, Gajevic had received information that Wilburn was in possession of some firearms. A search of Wilburn's person did not uncover any firearms. Nor did a search of the

8

automobile that Wilburn was driving uncover any firearms. Thus, Gajevic concluded that the firearms were more than likely in the apartment.

Gajevic was not certain if apartment number 7 at 5611 North 40th Street was Wilburn's residence, although he had received information from a confidential source that such was the case. In any event, Sophia Taylor advised Gajevic that she had lived at that apartment for the past six years and that Wilburn had resided there for approximately the past three months. Ms. Taylor asked what was happening to Wilburn and Gajevic told her that Wilburn was being arrested for driving after revocation. Gajevic then explained to Ms. Taylor that he had received information that Wilburn was in possession of several weapons, that Wilburn was a convicted felon and thus he is not allowed to possess any handguns.

Gajevic asked Ms. Taylor for consent to search the apartment. Ms. Taylor expressed concern about whether the officers would be tearing things apart in the apartment. In response to her concerns Gajevic testified that the following occurred:

> I told her more than likely I would look in some closets, but I would like to concentrate on where Mr. Wilburn has his belongings which more than likely would be a bedroom that either he shares by himself or shares with her, I wasn't sure before I got in there how many rooms were there, or how many bedrooms were in that apartment.
>
> . . . .
>
> And I explained to her just like I stated earlier. I had the feeling at that time that she might have been concerned about some other contraband that might be in the house, and I explained to her that, you know, this is not for – I'm not here for personal use marijuana or something else that you might not want me to find, I'm strictly here for the purpose of investigating this gun investigation and that's the focus of my search.

9

(Tr. at 90-91.) Ms. Taylor then gave her consent for the officers to search the apartment. Prior to their entry into the apartment the officers did not go back to Wilburn and ask for his consent to search the apartment.

> Gajevic further testified as follows:
>
> I asked her if – when he stayed there did they share the same bedroom, does he have things in his closet. These were all things that we addressed when she wanted to know how much of her apartment I was gonna search.
>
> . . . .
>
> I advised her that, you know, I would limit my scope to wherever she could direct me if Mr. Wilburn had property there. It could have been in the basement, I don't know.
>
> . . . .
>
> She didn't tell me per se that he had clothes there. She said he had property in the closet. When I searched the closet it was evident that there were clothes of Mr. Wilburn's in that closet.

(Tr. at 96.) Gajevic further testified that when he found some male clothes in the closet of the bedroom, Ms. Taylor identified them as belonging to Wilburn. The closet also contained some of her clothes. Gajevic found the gun in a black duffel bag tucked behind several boxes belonging to Ms. Taylor. This duffel bag was in the closet. The duffel bag was not open. Gajevic believes that it was zippered shut.

Gajevic also searched several of the boxes that were in the closet. Gajevic searched the dresser drawers, underneath the bed and underneath the mattress. Ms. Taylor told Gajevic that Wilburn slept in that bedroom with Ms. Taylor.

10

Finally, as noted previously, Simonis had occasion to speak with Ms. Taylor prior to the hearing. He obtained from her an affidavit, the text of which was read into the record at the hearing. Her affidavit states:

> Sophia Taylor 10/4/67. I reside in the City of Milwaukee, and state that on March 7, 2004, I resided at 6511 North 40th Street, apartment number 7. On March 7, 2004, the Milwaukee Police Department came to my house and asked permission to come into and search it, and I agreed. I consented to allow them to enter the house and consented to allow them to search my house. When I consented to this, I did so of my own free will and was not threatened or in any way pressured into giving this consent. I gave consent knowingly, freely and voluntarily. I gave this consent because I knew I didn't have anything to hide.

**B. Analysis**

To begin, in his brief in support of the motion to suppress Wilburn states that he does not challenge the admissibility of his statement to Simonis on either *Miranda* or voluntariness grounds. Instead, he challenges the admissibility of his statement solely on the grounds that it is a fruit of the search of the apartment, which search Wilburn claims was conducted in violation of his Fourth Amendment rights. Therefore, Wilburn's challenge to the admissibility of his statement and his challenge to the admissibility of physical evidence, i.e., the two guns, are based on the same alleged Fourth Amendment violations.

"Although the Fourth Amendment generally prohibits searches and seizures performed without a warrant, there is an exception when someone with actual or apparent authority consents to the search or seizure." *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir.1998). Consent to a search may be obtained from any person who has common authority over the property. *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000). Furthermore, whether a person has common authority is based on "mutual use of the property by persons generally having joint access or control

11

for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974). The government has the burden of establishing that the person giving consent had the required common authority to do so. *Denberg*, 212 F.3d at 991 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The government also bears the burden of proving that the consent was voluntary. *United States v. Evans*, 27 F.3d 1219, 1230 (7th Cir. 1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

Wilburn first argues that the search of the apartment 7 was unreasonable because, although the police obtained consent for the search from Sophia Taylor ("Taylor"), they did not obtain Wilburn's consent. Wilburn does not contest that Taylor had joint access and control over apartment 7, and thus authority to consent to a search of the apartment, but rather argues that the police should have also sought Wilburn's consent because he too had joint access and control over the apartment and was present. (Def.'s Br. at 9-11.)

For this argument, Wilburn relies on the Georgia Supreme Court decision in *State v. Randolph*, 604 S.E.2d 835 (Ga. 2004), *cert. granted*, 125 S. Ct. 1840 (2005). In *Randolph*, the court addressed a situation where the defendant refused to give officers permission to search his home, but then while in the defendant's presence, the defendant's wife gave consent to the search. *Id*. at 836. The court held that "consent to conduct a warrantless search of a residence given by one occupant is not valid in the face of the refusal of another occupant who is physically present at the scene . . . ." *Id*.

As the government points out, the facts here are not on all fours with *Randolph*. Wilburn never refused to consent to the search of apartment 7, albeit, he was never asked for his consent. Wilburn was arrested and placed in a police car parked in front of the apartment immediately before the search. Nevertheless, even if this court were to find *Randolph* persuasive, in order for it to be

12

applicable here, the holding would have to be extended. This court would have to hold not only that consent to conduct a search of a residence given by one occupant is not valid in the face of explicit refusal by another occupant, as the *Randolph* court held, but also that the police are required to seek the consent of other occupants who are nearby. The Washington Supreme Court held so on different facts (the non-consenting defendant was inside the office being searched along with his girlfriend who provided the consent), *State v. Leach*, 782 P.2d 1035, 1040 (Wash. 1989), but the case law in this circuit does not support such a holding under the current circumstances.

On this issue, the facts at hand are similar to the facts in *United States v. Matlock*, 415 U.S. 164 (1974). In *Matlock*, the defendant was arrested in the front yard of the home in which he lived. Another resident of that home then consented to its being searched. *Id*. at 167. The Court held that the consenting resident had authority to consent to the search and did not discuss any need for the police to also seek the defendant's consent. Similarly, the Seventh Circuit has upheld searches where only one occupant or resident consented to the search although other occupants or residents were present, again without discussing any need for officers to seek consent from each individual. *See, e.g., United States v. Denberg*, 212 F.3d 987 (7th Cir. 2000); *United States v. Rosario*, 962 F.2d 733 (7th Cir. 1992). Simply stated, the court is not aware of any authority in this circuit requiring police to obtain consent for a search from each person with authority to consent who is present. This is especially so when, as here, the person in question is "present" only in the sense that he or she is nearby, and not, for example, inside the residence being searched.

Based on the foregoing, the court finds that the police officers' failure to seek Wilburn's consent to search apartment 7 does not render the search in violation of the Fourth Amendment. This

13

is so because it is undisputed the Sophia Taylor had authority to consent to the search and did in fact consent to it.

Wilburn next argues that even if Taylor's consent to the search of the apartment was valid, Taylor did not have authority to consent to the search of the closed black duffle bag in which one of the guns was found. (Def.'s Br. at 13-14.)

As stated above, consent to a search is only valid if the person consenting has actual or apparent authority to consent. Once consent to search an area is given by a person which the proper authority, police need not obtain separate consent to search each container in that area, but rather, the initial consent is enough if it "would reasonably be understood to extend to a particular container." *Florida v. Jimeno*, 500 U.S. 248, 252 (1991). However, mere possession of a closed container by a third party does not necessarily give rise to actual or apparent authority to consent to a search of its contents. *United States v. Basinski*, 226F.3d 829, 834 (7th Cir. 2000). Therefore, even if there is valid consent to search a certain area, that does not necessarily mean that the person giving consent has the proper authority to consent to the search of particular containers within that area.

In *United States v. Melgar*, 227 F.3d 1038 (7th Cir. 2000), the Seventh Circuit considered a situation where police went to a hotel room and encountered seven individuals there (three men and four women). The police obtained the consent of only one of them, the renter, to search the room, and eventually found inside a purse incriminating evidence against one of the non-consenting occupants. Even though the police had no particular reason to believe that the purse belonged to the occupant who consented to the search (the odds were that it did not since there were three other female occupants and the consenting occupant had another purse with her), the court upheld the search reasoning that "the police had no reason to know that the floral purse they found . . . did not

14

belong to [the consenting occupant]." *Id*. at 1041. The court characterized the question at hand in this way:

> In a sense, the real question for closed container searches is which way the risk of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search . . . , or is it permissible if the police do not have reliable information that the container is not under the authorize's control.

*Id*.

The *Melgar* court went on to analyze the alternatives and found the more restrictive option (police must have positive knowledge of authority) to be unworkable. Such a rule "would impose an impossible burden on the police. It would mean that they could never search closed containers within a dwelling . . . without asking the person whose consent is being given *ex ante* about every item they might encounter." *Melgar*, 227 F.3d at 1042.

Therefore, because this court has already determined that Taylor's consent to the search of apartment 7 was valid, the police's search of the closed black duffle bag found inside the apartment was permissible unless the police had "reliable information" that the bag was not under Taylor's control. Wilburn presents two argument which he maintains demonstrate that Gajevic knew that the duffle bag belonged to Wilburn, and furthermore, that Gajevic had no reason to believe that Taylor had actual or apparent authority to consent to its search.

First, Wilburn points out that in obtaining consent for the search from Taylor, Gajevic represented that he was only interested in areas of the apartment in which Wilburn kept his belongings. Second, Wilburn urges the court to conclude that Gajevic knew the bag belonged to Wilburn because Gajevic testified that Taylor was inside the apartment during the search, and that Gajevic knew that some boxes he searched belonged to Taylor, yet he did not state that the duffel bag

15

belonged to Taylor. Therefore, Wilburn argues, it can be inferred that Gajevic knew that the bag belonged to Wilburn. (Def.'s Br. at 14.)

It is abundantly clear from Gajevic's testimony that he was only interested in searching areas of the apartment that might contain Wilburn's belongings. (Tr. at 90-91, 95.) This does not mean, however, that Taylor could not consent to the search of those areas. Taylor was able to consent to the search of property which she had common authority over; that is, if she had "mutual use of the property" or "generally [had] joint access or control for most purposes," of the property. *Matlock*, 415 U.S. at 171 n. 7. Therefore, even if Gajevic knew, for example, that a particular room contained many of Wilburn's belongings, if Taylor had mutual use of that room, she could consent to its search. Likewise, if Taylor had the mutual use of a container, such as the duffle bag, even if it was known that Wilburn had belongings inside, Taylor had authority to consent to its search. In the end, it does not matter whose belongings Gajevic was looking for, as long as he confined his search to areas which Taylor had actual or apparent authority to consent to the search of, and Taylor did in fact consent to the search of those areas.

Wilburn's next argument is that it can be inferred that Gajevic "knew" that the duffle bag belonged to Wilburn, and he therefore had no reason to believe that Taylor had actual or apparent authority to consent to its search. As stated above, once police have valid consent to search an area, and the consent is reasonably understood to extend to containers, it is permissible to search the containers "if the police do not have reliable information that the container is not under the authorize's control." *Melgar*, 227 F.3d at 1041.

Here, the duffle bag was found in a closet that contained both male and female clothing. (Tr. at 97.) That closet was in the bedroom which Taylor and Wilburn shared. (Tr. at 96.) Furthermore,

16

there is no evidence that the duffle bag was somehow marked with Wilburn's name, that it was the type of bag only a man would use, or that Gajevic was told that the bag belonged to Wilburn. A reasonable person would believe that a person has at least common authority over an unmarked duffle bag stored in their bedroom closet. And whether or not a reasonable person would believe there was authority is the test for apparent authority. *Basisnski*, 226 F.3d at 834.

Wilburn invites the court to infer that Gajevic knew that the duffle bag belonged to Wilburn from two pieces of information. First, Taylor was inside the apartment during the search and answered some questions as to who owned certain belongings. (Tr. at 97.) Second, Gajevic testified that some boxes belonged to Taylor, but did not testify that the duffle bag belonged to Taylor. (Def.'s Br. at 14.) However, in my opinion, these two pieces of information do not demonstrate that Gajevic was told or knew that the bag belonged to Wilburn. Gajevic did testify that some boxes he searched were Taylor's, but the record does not disclose whether Gajevic was told whom the boxes belonged to before he searched them, or instead that he simply drew conclusions as to whom they belonged based on what he found inside. (Tr. 98-99.) Furthermore, there is no indication that Gajevic asked Taylor to identify containers belonging to Wilburn and that he searched only those containers. According to Gajevic, he searched boxes belonging to Taylor as well as drawers in her dresser. (Tr. at 98.)

Without more, the court cannot conclude that Gajevic was told or knew that the duffle bag belonged to Wilburn. And without that, the court cannot conclude that the police had "reliable information" that the bag was not under Taylor's control. In the end, the facts here are similar to the facts in *Melgar*. In *Melgar*, the police searched a purse that might have belonged to the person who consented to the search, but which also might have belonged to one of the other occupants of the

17

room. Nevertheless, the court upheld the search because the police "had no reason to know" that the purse did not belong to the person who consented. *Melgar*, 227 F.3d at 1041. Likewise, the record does not disclose that Gajevic had reason to know that the duffle bag was not under Taylor's control.

In conclusion, and for all of the foregoing reasons, the court will recommend that Wilburn's motion to suppress his statement and physical evidence be denied.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

**SO ORDERED** this <u>13th</u> day of July 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge